(80 N. W. Rep. 765.)

---

FIRST NATIONAL BANK OF CORUNNA *vs*. MICHIGAN CITY BANK.

Opinion filed October 20, 1899.

**Banks—Authority of Cashier to Rediscount Paper.**

> The cashier of a state bank organized under Chapter 23 of the Laws of 1890 has no authority to borrow money, unless it is specially given by the board of directors.

**Burden of Proof to Show Authority or Ratification.**

> One who seeks to charge a banking corporation organized under said act upon a loan made by one of its officers must show that such officer had express authority from the directors to make the loan, or that it was ratified by them.

**Discount of Forged Paper by Cashier.**

> The plaintiff seeks to recover the amount due upon four notes, which are admitted to be forgeries as to the makers, which notes it claims to have rediscounted for the defendant in reliance upon the latter's promise to pay plaintiff the amounts they called for, when they became due. Plaintiff dealt with defendant's cashier only. *Held*, under the facts stated in the opinion, that the transaction was a loan. *Held*, further, that inasmuch as it does not appear that the cashier was authorized to make such loan by the directors of the defendant bank, or that his acts were ratified by them, the defendant is not liable therefor.

Appeal from District Court, Grand Forks County; *Fisk, J.*

Action by the First National Bank of Corunna, Mich., against the Michigan City Bank. Judgment for defendant, and plaintiff appeals.

Affirmed.

*Burke Corbet,* for appellant.

*Cochrane & Corliss,* for respondent.

YOUNG, J. The First National Bank of Corunna, Mich., sues the Michigan City Bank to recover the amount due upon certain promissory notes which it alleges it purchased from said bank in

FIRST NAT. BK. OF CORUNNA *v.* MICHIGAN CITY BK.     609

due course of business, and for value. It is conceded that the notes were forgeries as to the makers. Plaintiff states its cause of action in three counts,—the first upon a purchase; second, upon defendant's indorsement of the notes; and, third, upon a separate written guaranty of payment. The answer of defendant denies that it sold, indorsed, or guarantied the payment of said notes. A jury was waived, and the case was tried to the Court, resulting in findings and a judgment favorable to the defendant. Plaintiff appeals, and the case is here for trial anew.

It is undisputed that all of the transactions which took place between the plaintiff and defendant upon which the alleged liability of the defendant is based were had with one H. B. Cram, who purported to be defendant's cashier, and to be acting as such in such transactions as occurred. It is not claimed by plaintiff that it did any portion of the business with any other person or officer of the defendant bank, and it does not appear that there ever was any dealing between the plaintiff and defendant other than that here in question; so that the entire alleged liability of the defendant is based upon the acts of Cram. The defendant is organized under Chapter 23 of the Laws of 1890, providing for the organization and government of state banks. Its certificate of authority, authorizing it to commence the business of banking, was issued by the secretary of state on January 23, 1893. Prior to that time the stockholders had named its directors in the articles of association. There is no record of a formal meeting of the directors for any purpose until June 6, 1893, when a president and vice president were elected, and H. B. Cram was also elected as cashier. It is admitted by the defendant, however, that it had been doing a banking business since April 6th, and that during such time Cram acted as cashier, with the knowledge and consent of the directors. Plaintiff contends that he acted as cashier with the same consent and knowledge on the part of the directors prior to April 6th, and at all times after the bank was organized to do business. Whether his assumption of authority to act as cashier during this earlier period was with the consent and knowledge of the directors is a mooted question of fact, to which counsel for both parties have devoted much attention. The view which we take of the limitations upon a cashier's authority to bind his bank to the obligations which are here sought to be enforced is necessarily decisive of the case, and renders a determination of this disputed question unnecessary. It may be assumed that Cram was at all times the cashier of defendant bank, and that he was clothed with the usual authority of cashiers. Nevertheless, in our opinion, his acts, which are here relied upon to create a liability against the defendant, are so far beyond the ordinary duties and implied authority of a cashier that they do not bind the corporation, unless it is shown that he was specially authorized by the directors to do what he did, or unless

his acts have been ratified by them. The transaction was this: Early in the winter of 1893, Cram called at plaintiff's bank to interest it in discounting some paper for the defendant bank. It seems that plaintiff's cashier then orally agreed to rediscount a reasonable amount, and that the plaintiff then and at all times relied wholly upon Cram's promise that the defendant would itself pay all of the notes it should rediscount, when they became due. After this conversation, on February 22, 1893, Cram wrote plaintiff as follows: "If we make a deal, we guaranty all paper, and will pay all paper as fast as it becomes due. You send the notes to this bank for collection, and, as ·fast as they become due, we will send you New York drafts for same." Plaintiff's reply seems to have been favorable, for on February 27th Cram mailed to it 14 notes, aggregating in amount $2,527, and in his letter accompanying them said: "I note what you say in regard to discounts. These notes are all due next fall, and, as·I told you before, we will send N. Y. drafts for these as fast as they become due." Some time after receiving these notes, plaintiff remitted for them by sending two drafts drawn upon its New York correspondent payable to H. B. Cram, cashier. It sent $1,050 March 16th, and $1,477 on April 7th. Both drafts were received by Cram, and were deposited by him in the National German-American Bank of St. Paul, to the credit of an account which the evidence shows he carried there in the name of the Michigan City Bank, and were paid by the New York bank, and charged to plaintiff's account, in due course of business. When the notes matured, plaintiff sent them to the defendant "for payment." Upon their receipt, Cram wrote to plaintiff, using this language: "I will remit to you on the 13th of this month on the past-due discounts;" and on November 13th he sent plaintiff a New York draft for $1,889.58, covering the amount due on 9 of the notes. On January 25, 1894, Cram sent plaintiff 14 other notes, requesting it to discount them, and, after taking out the balance due on the notes formerly discounted, to remit the balance. Plaintiff selected 4 notes out of the 14, which amounted to $773.64. Out of this amount it reserved the balance due it, which was $743.60, and for the excess sent its draft on a Chicago bank, payable to H. B. Cram, cashier, in the letter returning the notes not discounted. This small draft was deposited by Cram in the Grand Forks National Bank to the credit of the defendant. These four notes so selected are the ones described in the complaint. It is conceded that they have not been paid, and that they, as well as all of the notes sent by Cram, were forgeries as to the makers. None of these notes appear to have been listed upon the books of the bank. It appears that Cram's dishonest methods were discovered some time after he drew the draft upon defendant's funds for the $1,889.58 remitted to plaintiff, and his resignation as cashier was obtained by the directors; but it was some time later before any of the officers of the bank knew of the existence of the four notes in suit, or that

plaintiff held other notes which it claimed to have discounted for defendant through Cram, as cashier.

We have stated the facts thus fully to show that this transaction was intended and understood by plaintiff to be merely a rediscount by it of certain paper which it supposed belonged to the defendant, and to be due to the latter from its customers. This, we take it, is not an unusual transaction between banks, and is one of the methods resorted to by them for lending and borrowing money. A bank whose necessities require it to raise funds for use usually secures them either by giving its own direct obligation or by rediscounting its customers' paper, with an accompanying promise to take it up when it is due, as was done in this case. Either method creates an obligation of the borrowing bank, which is represented by the note given or the note discounted. Both are methods of borrowing money. It is apparent that the plaintiff, to enforce its demands against the defendant, must show that the obligations which Cram undertook to make on behalf of the banking corporation which he represented in the capacity of cashier were either authorized by its directors, or that his acts, if unauthorized, were ratified by them, or it must appear that he had the authority to borrow money and enter into the obligations in question by virtue of his authority as cashier, and independent of any authorization or ratification. It is not claimed that any special authority was given to him, and there is an entire failure to show that his acts have been ratified; so that the liability of defendant depends upon the single question of Cram's power to bind defendant for a loan ostensibly negotiated for it arising out of his general authority as cashier. Both reason and judicial interpretation lead us to deny that he had such authority. Chapter 23 of the Laws of 1890, under which the defendant is organized, is copied from the national banking act. That portion of the act relating to the powers of banks is found in subdivision 7 of section 4 of said chapter, and is the same as Rev. St. U. S. § 5136, par. 7, and reads as follows: "To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, bills of exchange, drafts and other evidences of debt, by receiving deposits, by buying and selling exchange, coin and bullion, by loaning money on personal security." To this the parent statute has added the power of obtaining, issuing, and circulating notes. The question of the borrowing power of a banking corporation under this section, and the lawful manner of its exercise, was squarely before the Supreme Court of the United States in the case of *Bank* v. *Armstrong*, 152 U. S. 346, 14 Sup. Ct. Rep. 572, decided in 1893; and it was then held that the borrowing of money was so much out of the course of legitimate banking that those making a loan to a bank must see to it that the officer assuming to act had special authority to act. After quoting Rev. St. U. S. § 5136, par. 7, the Court said: "The power to borrow money or to give notes

is not expressly given by the act. The business of the bank is to lend, not to borrow, money; to discount the notes of others, not to get its own notes discounted. Still, as was said by the Court, in the case of *First Nat. Bank* v. *National Exch. Bank*, 92 U. S. 127, 'authority is given in the act to transact such a banking business as is specified, and all necessary powers to carry it on are granted. These powers are such as are required to meet all the legitimate demands of the business, and to enable a bank to conduct its affairs, within the scope of its charter, safely and prudently. This necessarily implies the right of a bank to incur liabilities in the regular course of its business, as well as to become the creditor of others.' Nor do we doubt that a bank, in certain circumstances, may become a temporary borrower of money. Yet such transactions would be so much out of the course of ordinary and legitimate banking as to require those making the loan to see that the officer or agent acting for the bank had special authority to borrow money." It is true that the official whose action was in question in this case was the vice president, but there was evidence which went to show that he was the principal executive officer of the bank; and the Court, in its opinion, assumed that he was, but said that "it is yet obvious that the vice president, however general his powers, could not exercise such a power unless especially authorized so to do, and it is equally obvious that persons dealing with a bank are presumed to know the extent of the general powers of the officers." Later the Circuit Court of Appeals, Sixth Circuit, in *Bank* v. *Armstrong*, 13 C. C. A. 47, 65 Fed. Rep. 573, in following this case, refers to it as holding that "the borrowing of money by a bank, though not illegal, is so much out of the course of ordinary and legitimate banking business as to require those making the loan to see to it that the officer or agent acting for the bank had special authority to borrow money, and that where no such special authority appears, and no ratification of the unauthorized act is shown, the bank is not liable." Further on in its opinion, that Court, after citing copiously from state courts, said: "The effect of the foregoing cases is that it is within the usual course of banking business for a bank to borrow money, and that the generally recognized authority of the cashier or managing officer of the bank extends to making such loans, and that therefore any one dealing with such officer has the right to rely on the existence of such authority unless the contrary appears;" and then adds: "The effect of the decision in *Bank* v. *Armstrong* is to make the above rule as to the authority of a cashier to borrow money for the bank inapplicable to national banks." In view of the close relationship of our statute under which defendant exists with the national banking act from which it is admitted the act of 1890 is copied, these decisions are, we think, decisive as to the authority of a cashier of a state bank organized under this law to borrow money; and we have no hesitation in adopting their interpretation, which appeals to us as both sound and salutary.

The District Court gave plaintiff judgment for $30.04, with 7 per cent. interest from January 29, 1894, for the small draft which was sent by it on that date, and deposited to defendant's credit in the Grand Forks National Bank. This we do not disturb. The judgment of the District Court is affirmed. All concur.